## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Michael Buono, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 2021 Hickoryleaf Lane, Raymore, Missouri, hereinafter "PREMISES," further described in Attachment A, for the things described in Attachment B.

2.      I am a Special Agent for the Federal Bureau of Investigation (FBI) in Kansas City, Missouri (MO) and have been assigned to this office since June 2016. I am currently assigned to Squad 13 (Domestic Terrorism and Weapons of Mass Destruction), which is a component of the Joint Terrorism Task Force. I previously worked International Terrorism matters at the FBI's Kansas City Office from June 2016 to December 2017. I was assigned as a Special Agent to the Joint Terrorism Task Force in the FBI's Milwaukee Field Office from July 2012 to June 2016, and I supported criminal and national security investigations within a surveillance capacity from 2006 to 2012 in the FBI's Atlanta Field Office. Through my experience, education, and training, I have become familiar with the manner in which explosive devices are manufactured and have participated in the investigation of potential violations of the U.S. criminal laws that govern domestic terrorism and the manufacturing of improvised explosive devices.

3.      The facts in this affidavit come from my personal observations, my review of documents and records, my training and experience, and information obtained from other agents and witnesses with direct knowledge of the facts of this case. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.         I make this affidavit in support of the requested warrant relating to violations of law by TIMOTHY ROBERT WILSON, in particular, a violation of 18 U.S.C. § 2339A, providing material support or resources to terrorists; 18 U.S.C. 842(p), distribution of information relating to explosives, destructive devices, and weapons of mass destruction; and 18 U.S.C. § 2332a, use or attempted use of weapons of mass destruction. I assert that there is probable cause for the requested warrant based on the following facts:

## WILSON'S BACKGROUND AND COMMUNICATIONS

5.         In September 2019, Timothy R. WILSON engaged in discussions on an encrypted messaging application (hereinafter referred to as the "App") with Jarrett William Smith (Smith) a.k.a. "Kosmik." On September 21, 2019, Smith was arrested and charged in the District of Kansas with two counts of 18 U.S.C. 842(p), Distribution of Information Relating to Explosives, Destructive Devices, and Weapons of Mass Destruction, and one count of 18 U.S.C. 875(c), Threatening Interstate Communication.

6.         Based on information from a confidential human source ("CHS-1") discussed below, an investigation was initiated on WILSON on September 18, 2019, and physical surveillance was instituted on WILSON shortly thereafter. CHS-1 has provided corroborated information to investigators over the last approximately nine months. CHS-1 has previously been convicted of a felony and has been compensated for information provided about WILSON. CHS-based information in this affidavit is primarily derived from screenshots of messages between CHS-1 and WILSON; it is noted where information is provided from CHS-1 that is not contained in screenshots.

7.         In September 2019, WILSON shared several manuals describing how to create explosives and booby traps via an encrypted email service to CHS-1. WILSON stated, "Not sure

2

if you have one of these but if not here you go. On a side note if your [sic] a fed then I suppose you got me now. If that's the case make sure you bring lots of body bags when you raid my house lol."

8.      WILSON has also stated he keeps firearms at his house. A "trash cover" of WILSON's garbage at 2021 Hickoryleaf Lane, Raymore, Missouri, on September 25, 2019, revealed two empty boxes of 7.62x39mm ammunition, packaging for two 7.62x39mm Magpul 30-round magazines, and a receipt from Academy Sports + Outdoors, located in Belton, Missouri. The receipt revealed WILSON purchased two 7.62x39mm magazines on September 19, 2019, with a debit card ending in 1353. Based on my training, knowledge and experience, the 7.62x39mm accessories and ammunition are usable in an AK-47 rifle.

9.      On September 26, 2019, CHS-1 reported that WILSON identified FBI physical surveillance and stated that the "jokes on them because I moved all of my gear to a safe undisclosed location after Kosmik [i.e., Smith] got picked up," "So I'm always packing," "right now I'm gonna play it like everything is normal but watch my back," and "figure maybe I'll lay low till Pennsylvania." At the same time the conversation between WILSON and CHS-1 was occurring, FBI surveillance observed WILSON conducting counter-surveillance measures.

10.     CHS-1 reported that on September 30, 2019, WILSON expressed an interest in joining a group via an online TOR[1] site. WILSON stated "It's a tor site so I'll have to use my dark web laptop." When trying to share the group's application with CHS-1, CHS-1 asked "can it be forward [sic]," and WILSON replied "I don't know I'm on tor on my throwaway laptop."

---

[1] TOR is a browser designed for anonymous web browsing.

11.     In October 2019, WILSON messaged the following comments to CHS-1 on the App: "I've got plans however I'm not quite ready yet as I'm waiting for a few key things to happen but still planning I will elaborate more in person," and "I look forward to speaking to you more on this subject in person hopefully in PA . . ."

12.     On October 15, 2019, WILSON messaged CHS-1 and stated, "if we could get 10-15 people it would be all we need to start things." WILSON messaged, "I've got quite a bit [of ammunition]," "About 1000 556 [5.56 mm], [1000] 762 [7.62mm] quite a few 20g shells too Some slugs sunbird shot some buckshot." "I've got flack jacket and kevlar helm too," "Tiger stripe and multi cam gear."

13.     WILSON also engaged in private conversations with an undercover FBI Agent (UC-1) on the App after Smith's arrest. On October 31, 2019, WILSON forwarded several messages with instructions to make "Molotov" cocktails and "rudimentary napalm." WILSON then stated, "Just trying to give out some helpful facts lol," "Just save you a little bit of Halloween candy go out to the ghetto and set it in the middle of the street," "When the Niggers come out drop the napalm on em." On October 31, 2019, WILSON distributed manuals related to how to construct improvised explosive devices to UC-1 and CHS-1 on the App. The manuals included: "Big Book of Mischief;" "Homemade C4;" "Blasting Caps Initiatable By Thermal Detonation;" "Professional Homemade Cherry Bombs;" "Middle Eastern Bomb Designs;" "Mujahadeen Explosive Handbook;" and "Revised Black Book of Explosives." Subsequent to sending these manuals, WILSON messaged, "I guess if you two are feds I'm fucked now lol." These manuals contain instructions for creating a variety of explosive devices.

14.     On or around November 7, 2019, WILSON, operating his white 2018 Ford F150, bearing Missouri license plate number 5XXXXX (MO 5XXXXX), drove approximately 1,000

4

miles from Raymore, Missouri, to Coudersport, Pennsylvania, to meet UC-1. WILSON shared his ideas with UC-1, including: "go into a fucking completely nigger elementary school and just fucking shoot the place up;" attacking the power grid with mylar balloons; and attacking bridges and substations with explosives. WILSON stated his goal was "to create enough chaos to kick start a revolution." WILSON also stated he had some fertilizer stored at his workplace. WILSON stated during the initial meeting that his plans were currently abstract and he had an approximately five-year timeline.

15.     After the in-person meeting in Pennsylvania on November 8, 2019, WILSON and UC-1 continued to converse online via the App. WILSON claimed his fertilizer supply was used by individuals at his work. WILSON also stated, "I'm currently getting my shit in order I want to give my kids a good Thanksgiving good Christmas and a good birthday and then I'm probably on full-time with operation boogaloo." Based on my training, knowledge, and experience, the term, "boogaloo," is used to describe an impending racial civil war or collapse of society. When UC-1 asked WILSON, "Hey brother. I'm digging what you are saying but I got to ask, what changed the timeline," WILSON replied ". . . I never imagine growing old even with my kids I never imagined really watching them grow up I never thought I'd make it this far in life and yet here I am and I always thought I'd go out in a blaze of glory . . ." WILSON again stated, "I want to give my kids a really good Thanksgiving I [sic] really good Christmas and a very memorable birthday party this year for at least hopefully have some good memories of me everything I do after that I do for them and I do for our people."

16.     WILSON and UC-1 planned a meeting in Belton, Missouri, in December 2019 for the purpose of securing a storage unit where WILSON could begin storing "garden supplies." WILSON and UC-1 have used "garden" as the code word for "bomb" in their communications.

5

On November 25, 2019, in reference to proposed storage space dimensions, WILSON stated, "Idk how much you need to make the garden grow would a 5x10 be enough space," "I'd imagine that you would need enough to fill a UHual [sic]." WILSON then shared a digital photograph of a webpage detailing the dimensions and storage capacity of a 20 foot truck. WILSON stated, "Here is The dimensions for a 20 inch Uhaul truck."

17.     On November 30, 2019, WILSON messaged UC-1 and CHS-1, "This has been a shitty fucking weekend come January I'm ready to get my hands dirty fuck it I'm just done this is all I have left," "What ever [sic] you need me to do I'm on board."

18.     On December 21, 2019, UC-1 met WILSON in a shopping center parking lot in Belton, Missouri. During the meeting, UC-1 leased a storage unit for WILSON and UC-1 in Belton, Missouri, and showed WILSON the unit. While UC-1 showed WILSON the inside of the storage unit, WILSON stated, "yeah, this should be plenty of space," and "March-April is when, uh, I'll be startin' to get some stuff in." UC-1 told WILSON they will share the storage unit, and that the unit was for both of them. UC-1 gave WILSON a key to the storage unit and kept a key for himself.

19.     UC-1 also purchased a Bushmaster Firearms XM 15-E2S rifle, 5.56 ammunition, five magazines, and a gun bag from WILSON during their December 21, 2019, meeting. The transaction occurred at WILSON'S parent's residence, located at 903 E. Walnut Avenue, Belton, MO. UC-1 waited in the living room area, and WILSON walked from view to another location of the residence, and returned with the rifle, ammunition, and accessories. It is believed that 903 E. Walnut Avenue, Belton, MO is a location where WILSON stores some of his "gear," which is believed to include firearms, ammunition, a flak jacket, Kevlar helmet, and military style clothing.

20.     On January 12, 2020, WILSON forwarded a chart on the App that detailed the explosive standards and estimated blast radius of various sized vehicles when used as a vehicle-borne improvised explosive device (VBIED). WILSON messaged, "Some good info to *cough cough* know how far you have to run to be safe from a terrorist attack."

21.     On January 27, 2020, WILSON messaged UC-1 and CHS-1 stating, "I put out some feelers at work today, we have a refugee program that teaches these leaches how to farm." "I'm hoping I can snag some of their fertilizer for our cause . . ." UC-1 responded, "Thinking on your feet huh lol." To which WILSON replied, "Trying to get the biggest bang for our buck [winking emoji]."

22.     On January 30, 2020, WILSON claimed to purchase two five-pound bags of explosive precursors[2] through a business account at his workplace. WILSON shared pictures of the Amazon.com order confirmation through the App that corroborated his claim. WILSON stated his boss was "not the type to ask questions hell I could go and buy some crappy fertilizer and throw it in the shed and he'll think it's the stuff I ordered off of Amazon so we are good."

23.     On January 31, 2020, WILSON, believing that the explosive precursor he purchased was unsuitable for his plans, messaged UC-1 and CHS-1, "Fuck the shit I bought is worthless." WILSON messaged, "According to that book it contains synthetic shit not as good for our purpose." It is believed "that book" is a reference to the explosives manuals that WILSON distributed to UC-1 and CHS-1 on October 31, 2019, several of which discuss use of explosive precursors referenced by WILSON for making explosives. WILSON then stated, "I need to buy

---

[2] The names of the specific explosive precursors have been withheld from this affidavit. An FBI Special Agent Bomb Technician verified that the various chemicals purchased and referenced by WILSON are viable for use in explosives.

[chemical] I got [chemical]." Based on my training, knowledge, and experience, as well as my consultation with an FBI Special Agent Bomb Technician, the chemicals referenced by WILSON are a precursor for the manufacture of a binary explosive.[3]

24.     In a subsequent conversation, WILSON claimed he "Just got 50lbs of the good stuff online." Based on the context of the conversation, it is believed WILSON was again referring to an explosive precursor.

25.     Following the explosive precursor purchase, WILSON told UC-1 and CHS-1, "I guess we are unofficially being sponsored by the Catholic Church now lol, so we are doing the Lords work lol." WILSON'S workplace is a non-profit organization affiliated with the Catholic Church. During the same conversation WILSON also stated, "Idk if he [UC-1] wants to make c4 or not but it sounds like it would be easier to just have it go off rather than making bricks," and "How did mcveigh do it." Timothy McVeigh perpetrated the 1995 Oklahoma City bombing with a VBIED that killed 168 people and injured over 680 others.

26.     On February 1, 2020, WILSON messaged a picture of a bag of an explosive precursor[4] through the App, and stated, "1st shipment is in." On February 6, 2020, WILSON messaged a picture of a hand holding a bag of an explosive precursor through the App and stated, "Guess what I just got boys." WILSON also contacted UC-1 via text message by a cellular phone on February 5, 2020. WILSON's text message stated, "Got 50lbs of [precursor] and 10 lbs of [precursor]." On February 6, 2020, he texted, "I will drop off this week end."

_____

[3] A binary explosive is an explosive consisting of two components which must be mixed in order to become explosive.

[4] The names of the specific explosive precursors have been removed from this affidavit. An FBI Special Agent Bomb Technician verified that the various chemicals purchased by WILSON are viable for use in explosives.

27.     On February 6, 2020, WILSON and UC-1 had a telephone conversation. WILSON again explained he had purchased fifty pounds of "the good stuff," and he would be dropping off the material at the storage location in Belton, Missouri. WILSON asked UC-1 whether he knew anyone that would purchase personally identifiable information (PII).[5] WILSON stated he could obtain PII of the residents in the halfway house where he worked. WILSON stated money from this scheme could be used to fund "the movement." WILSON then discussed obtaining containers to store the materials he had purchased. WILSON stated that in addition to the fifty pounds of material he obtained, he also acquired ten pounds of a phosphate material and another material. WILSON stated he bought these materials together as he believed it would be less suspicious. All phone conversations between UC-1 and WILSON were recorded. The recording on February 6, 2020, failed to clearly capture WILSON's portion of the conversation.

28.     On January 30, 2020, WILSON messaged UC-1 and CHS-1, "Also att prepaid phones ask for 0 info to activate other than a zip code," "you can pay everything cash," and "Mine should be active in 10 min." WILSON then sent an image of a hand holding a mobile phone and stated, "Non smart flip phone." WILSON stated his "Burner number is 1(816)[XXX-XXXX]" to UC-1 and CHS-1, and, "Just put me in as werwolfe or wolf man or something lol." On February 8, 2020, WILSON messaged CHS-1 and UC-1 via the App and stated, "Remember when you get your burner to," "Turn off geolocation," "Turn off data," "Turn off Bluetooth," "Turn off WiFi." All subsequent telephone conversations between WILSON and UC-1 were made over the "burner phones."

---

[5] PII refers to information such as name, date of birth, or social security that can identify an individual. This information is commonly used for fraud and identity theft.

9

29.     On February 8, 2020, WILSON messaged CHS-1 and UC-1 via the App and stated, "So I've been trying to find a rain barrel to keep this stuff and no luck so far and all the places around where I'm at I might just keep it in a tote for the time being." UC-1 responded, "Done", "That's fine for now." On February 8, 2020, at approximately 8:46 a.m. PST, UC-1 received a missed call from WILSON. UC-1 called WILSON back at 8:50 a.m. PST. WILSON stated he could not find a rain barrel to store the material in. WILSON inquired whether a 32 gallon trash can would do the same thing. UC-1 confirmed that a trash can would be sufficient.

30.     On February 8, 2020, video surveillance of the storage facility captured WILSON parking his truck near the storage unit. WILSON unloaded items from his truck and loaded the items into the storage unit rented by UC-1. Approximately nine minutes after WILSON departed the storage unit, WILSON contacted UC-1 on the App, and stated, "It's all deposited."

31.     I and a Special Agent Bomb Technician confirmed that WILSON had placed the explosive precursors into a 32 gallon garbage bin. The bags matched the pictures sent by WILSON on the App. Additionally, WILSON placed two empty gasoline containers in the storage facility.

32.     On February 14, 2020, WILSON made a post on his VK[6] profile (under the name Jon Wilson) stating, "Democracy has failed the time for empty talk is over we need men of action. Go out and do something don't tell anyone just make a plan and get it done." On February 14, 2020, WILSON stated in a "NSM Media chat"[7] group, "The time for talk is over democracy has failed, we need men of action."

---

[6] VK is a Russian based social media website.

[7] The National Socialist Movement (NSM) is a neo-Nazi organization.

33.     On February 21, 2020, WILSON attempted to recruit another individual for his plan. WILSON messaged CHS-1, "So I got in contact with the guy that me and him are really tight back when we were in the Navy and I'm gonna see about maybe trying to bring him into the fold we had similar views back then but that was 15 years ago so I'm gonna see where he's at." "If he's like he was 15 years ago he will be down for the order, but I've got to feel him out. Shit could have changed." "The Order" refers to the private encrypted chat group on the App WILSON created to organize his plan to commit an attack. WILSON subsequently stated that the individual declined.

34.     On February 25, 2020, WILSON messaged UC-1 via the App and stated, "Won't be able to do the 20th I'll have my kids that weekend, you might just have to pick something, or pick somewhere that you think will have an impact." UC-1 responded, "Hey brother, if the stuff about the kids in the money is for real, I'll just wait on you for when it makes sense. That being said, if it's an excuse so I can carry the load rather than you just be honest with me and tell me so I can move on down the road." WILSON then explained his financial situation. WILSON and UC-1 then had a phone conversation. UC-1 again told WILSON if he didn't want to continue with the plan, he should just tell him. WILSON said, "If that was the case, I'd just tell you . . . I'm pretty far into it as it is." WILSON then again explained his financial situation. WILSON stated that after Nationals[8] he would have his tax money and would have time off. WILSON and UC-1 then discussed potential cities to visit and agreed April would be a good time to meet to "scout around."

35.     On February 28, 2020, WILSON and UC-1 had another telephone conversation. During this conversation WILSON and UC-1 discussed meeting to scout potential targets for an

---

[8] "Nationals" refers to the National Socialist Movement convention planned for around April 16–18, 2020.

attack. WILSON suggested Arkansas. WILSON suggested meeting by Springfield, Missouri, on April 20th or 21st, and then driving to Arkansas.

36.     On February 29, 2020, WILSON messaged UC-1 via the App and expressed concern about going to the NSM meeting in April because an "NSM member got doxxed."[9] WILSON stated, "What we are doing is way more important and I don't want to blow our cover by getting doxxed," "Cause if word gets to my employer about my political beliefs they might put 2 and 2 together and tell the feds I don't want that to happen." WILSON subsequently decided he would not go to the April NSM meeting (i.e., Nationals), and stated to UC-1: "So I'll be free April 15-22nd we can meet up anytime there."

37.     WILSON then set up a new "secret chat" via the App for WILSON and UC-1. This chat had security measures available, to include: "Use end-to-end encryption;" "Leave no trace on our servers;" "Have a self-destruct timer;" and "Do not allow forwarding." WILSON stated, "It has way more security will be better to talk on that."

38.     On February 9, 2020, UC-1 messaged WILSON via the App, "Hey brother. Next time you are at a hardware store can you grab us a toggle switch? Its basically a light switch looking thing. Should be 5 bucks or less. I should be getting some [blasting] caps in soon fyi." WILSON agreed to buy a switch. On March 2, 2020, WILSON sent two pictures of various switches in a store and asked which one they needed. On March 4, 2020, video surveillance at a Lowe's in Kansas City, Missouri, captured WILSON entering the store and purchase several items. The digital receipt for the purchased items by customer "Timothy Wilson," included an "HBL 15/20A

_____

[9] "Doxxing" refers generally to publishing private or identifying information about a particular individual over the internet.

12

COMM 4WAY SWIT." WILSON messaged UC-1 the same day and stated, "I got the switch I'll drop it off tomorrow." Lowe's surveillance camera also captured WILSON arriving and departing the Lowe's parking lot in his white Ford F150.

39.     On March 8, 2020, WILSON messaged UC-1 and stated, "Hey when we meet up in April do you want me to bring that stuff with me? Or just leave it be? Just wondering." UC-1 replied, "Just leave it where it is." On March 9, 2020, WILSON messaged UC-1 via the App and stated, "June 20th is the summer solstice," "Might be a good day to hit something." UC-1 responded, "Makes sense to me." "You still thinking somewhere in Arkansas? If so any idea what." WILSON responded, "Ya but not sure what," "I just think security would be pretty lax over there because nothing really happens over there," "I'm going to look at some stuff at work tomorrow." On March 10, 2020, WILSON messaged UC-1 via the App, "So I'm looking around at stuff and my question is, are we doing this like Mcviegh with a moving truck? Or some other way?" "Cause most fed buildings and places like hospitals have security and a u haul would prob stand out." "There are 2 Islamic centers south of Springfield that might make good targets," "Also Walmart hq is there might make a good target but idk what there security is like," "Also a big synagogue there," "They also have a nuclear plant," "But it's further down in the middle of the state."

40.     On March 10, 2020, WILSON messaged UC-1 and CHS-1 on the App and stated, "All right so I'm not really all that worried about coronavirus but just in case say one of us gets it what's the plan," "I'm thinking probably just to Lonewolf ballistic and try to take out as many as I can during that time but I don't want to go sit in a hospital bed and then die doing nothing." WILSON stated, "I mean no doubt I'm gonna go in like you know hug every nigger and jew I can find but after that."

13

41.     On March 14, 2020, WILSON shared a video titled, "FULL LIVESTREAM OF CHRISTCHURCH MOSQUE SHOOTING." WILSON stated, "Just going to put it here for safekeeping." The mass shooting that killed 51 people at two mosques in Christchurch, New Zealand, occurred on March 15, 2019.

42.     On March 17, 2020, WILSON messaged CHS-1 and UC-1 via the App and stated "IF Marshall Law goes into effect delete everything you have from me (IF)," and "I know several people who have gotten out of the military recently and they all said they've been called back," and "That is not a good sign." WILSON was formerly in the United States Navy, and claims to have knowledge on how military bases operate. WILSON and CHS-1 subsequently had a phone conversation. WILSON stated that if quarantine from the new coronavirus happens, CHS-1 should delete all messages from him so CHS-1 wouldn't be implicated. When CHS-1 asked why, WILSON stated he would go and look for HVTs [high value targets], and that he was not going to sit there and wait for the government to come and kill him. WILSON also stated that UC-1 was not seeing what he is seeing. CHS-1 reported that WILSON had a serious tone during the conversation and did not joke or laugh. This phone conversation was recounted to the FBI by CHS-1 and was not recorded.

43.     UC-1 contacted WILSON on March 18, 2020, on WILSON's "burner" phone number 816-XXX-XXXX, and asked WILSON do we need to accelerate things and does he need the UC-1 to come his way. UC-1 stated he could be in WILSON's area the weekend of March 21, 2020, with some supplies. WILSON replied, "hitting a hospital would be like prime target right now," and "I know over here like uh people that are sick are going over to KU, but at the same time like I don't know what security is like over there..." "KU" refers to University of Kansas Medical Center in Kansas City, Kansas. WILSON told UC-1 that "if you wanted to come up this

14

weekend, we could I mean yeah we could drive around and kinda look around at things, but I think that right now with the way everything is going it could be prime time like I'd hate to wait til' April and then worst case scenario you know they've locked everything down tight where you can't travel and we miss the opportunity…"

44.     On March 19, 2020, WILSON sent a video to UC-1 and CHS-1 via an encrypted messaging app, and messaged, "First video that I posted is the army reserve base that we have in Missouri and the second video is the Kansas national guard armory," and "Sorry that they are not better quality and what not but I was trying to not bring attention to myself for obvious reasons." On March 19, 2020, an FBI surveillance team noted MO 5XXXXX was in the area of the United States Army Reserve Center in Kansas City, Missouri and the Kansas National Guard Armory in Kansas City, Kansas.

45.     UC-1 traveled to Belton, Missouri, on March 22, 2020, and met with WILSON. This meeting was captured by audio and video recording. UC-1 met WILSON at a parking lot, and WILSON got into UC-1's vehicle. WILSON and UC-1 then discussed potential targets. WILSON suggested a hospital, a police station, and power stations. UC-1 asked WILSON which target he would prefer. WILSON preferred the hospital as a target due to the potential impact it would have. WILSON gave UC-1 directions to Belton Regional Medical Center (BRMC). WILSON and UC-1 drove to BRMC and conducted an initial reconnaissance of the area. WILSON suggested potential locations to park a VBIED. WILSON noted an area on the building that had glass windows, stating the fragmentation of the glass had potential to serve as shrapnel. WILSON also noted that even if the attack didn't result in a "mass casualty" event, it would have a significant impact in the media.

46.     UC-1 asked WILSON how he envisioned the attack will be executed. WILSON suggested that he would drive the vehicle carrying the VBIED, and that it would be a two person operation. WILSON would wear all black to avoid detection. UC-1 would leave the VBIED in a specified Walmart parking lot. WILSON would then walk from his house to the Walmart parking lot to retrieve the VBIED. WILSON would then drive the VBIED to the previously identified spot at the hospital and leave the vehicle there. WILSON would activate the timer for the VBIED. WILSON suggested 20 minutes would be the ideal delay before the VBIED exploded. WILSON would then move to a predetermined location to be picked up by UC-1 in a vehicle. UC-1 would then drop WILSON at a specified location where he could then walk back to his house in Raymore, Missouri. WILSON would move to his house through a back wooded area and enter into his back door.

47.     UC-1 asked WILSON what the timeframe was for this attack. WILSON noted that a stay-at-home order due to COVID-19 will go into effect for Kansas City, Missouri, at midnight on Tuesday, March 24, 2020. WILSON explained it would be better to conduct their attack prior to the stay-at-home order going into effect, or else they would draw suspicion being one of the only vehicles on the road. UC-1 explained that he would get a completed VBIED ready as fast as possible, but it would likely be completed by Tuesday. WILSON and UC-1 agreed on Tuesday, March 24, 2020, as the date of the attack.

48.     After the initial reconnaissance of BRMC and the discussion of the plan, WILSON suggested conducting a timed dry-run. UC-1 and WILSON conducted a dry-run in UC-1's vehicle, where WILSON timed how long it would take to complete the route from the time he was picked up by UC-1 after delivering the VBIED to the time he was dropped off near his house.

16

49.     WILSON asked UC-1 what the plan was for a worst-case scenario if they got pulled over subsequent to placing the VBIED. WILSON planned to be laying down in the backseat of UC-1's vehicle. WILSON suggested he could shoot a police officer if they were pulled over. WILSON and UC-1 discussed what they would do after the attack. They agreed they would not talk to each other. WILSON explained if the attack led back to him, there would be a "firefight" at his house. WILSON provided UC-1 with driving directions on how to proceed to the highway and recommended a direction of travel.

50.     WILSON and UC-1 then drove to the storage unit in Belton, Missouri. Upon arrival at the storage unit, WILSON and UC-1 loaded the explosive precursors, switch, fuel containers, and 32-gallon trash bin that WILSON had purchased into UC-1's vehicle. UC-1 explained he was taking these materials to "my guy." Throughout the meeting, UC-1 referred to the individual that would assemble the VBIED as "my guy." UC-1 and WILSON left the storage unit, and UC-1 dropped WILSON back off at his truck.

## PROBABLE CAUSE TO SEARCH THE PREMISES

51.     The PREMISES is WILSON's primary residence. WILSON has been observed by FBI surveillance living at the PREMISES over the last approximately eight months. WILSON's vehicle registration, bank records, and cell phone bills confirm WILSON resides at the PREMISES. The PREMISES is owned by WILSON's grandmother who also resides at the PREMISES.

52.     During the course of the investigation, WILSON has communicated to UC-1 and CHS-1 his intention of carrying out an attack using firearms and a VBIED. WILSON made multiple communications, specifically cellular telephone calls, text messages, and sent and received encrypted messages via online applications, while physically located at the PREMISES,

17

which was confirmed by FBI surveillance, and UC-1 and CHS-1 reporting. FBI surveillance has observed WILSON leaving and returning to the PREMISES prior to and following both meetings between WILSON and UC-1 in Belton, Missouri, on December 21, 2019, and March 22, 2020. The content and timing of the communications between WILSON, UC-1, and CHS-1, indicate WILSON was actively plotting and planning an attack while at the PREMISES. Therefore any notes, records, manuals, transcripts, and other similar documents retained by WILSON, whether stored physically or digitally, related to his online messaging accounts, purchases or efforts to acquire bomb components and/or chemical precursors, and criminal intent or motivation with respect to committing an attack would be located in the PREMISES.

53.     WILSON regularly utilized electronic devices, including two cellular telephones and a laptop computer, to communicate with CHS-1 and UC-1. In September 2019, WILSON communicated to the CHS-1, "on tor on my throwaway laptop," and that he was using his "dark web laptop" to obtain information on joining a group. I know based on training and experience that WILSON's terms, "tor" and the "dark web," are references to online software known as The Onion Router (TOR), and the use of devices and techniques to mask a Media Access Control (MAC) address in an effort to remain anonymous, including records of Internet Protocol addresses used and records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses. I also know based on training and experience that a "throwaway laptop" is a general reference to a computer used to access and browse the Internet anonymously or undetected that can be readily discarded. WILSON also communicated with CHS-1 and UC-1 telephonically and on encrypted messaging applications on at least two cell phones, including a prepaid "flip phone" that WILSON referred to as a "burner." Based on

18

knowledge and experience, the regular use of unattributable electronic devices and methods, such as a throwaway laptop, encrypted messaging, a burner phone, and the use of a TOR browser, is to avoid detection or surveillance. Accordingly, evidence of WILSON's preparation in support of an act of terrorism may be stored on those devices.

54.     Items specific to firearms, firearm accessories, ammunition, and tactical gear, including body armor and other equipment providing ballistic protection, are also likely to be found in the PREMISES. On September 26, 2019, CHS-1 reported that WILSON identified FBI physical surveillance and stated, "jokes on them because I moved all of my gear to a safe undisclosed location after Kosmik [i.e., Smith] got picked up," "right now I'm gonna play it like everything is normal but watch my back," and "figure maybe I'll lay low till Pennsylvania." The precise location of the "safe undisclosed location" has not been revealed by WILSON.

55.     On September 25, 2019, boxes of ammunition, packaging for magazines, and a receipt for the purchase of items related to firearm accessories were found in WILSON's trash at the PREMISES. In October 2019, WILSON communicated to CHS-1 that he has 1,000 rounds of 5.56 mm ammunition, 1,000 rounds of 7.62mm ammunition, and "quite a few" shotgun shells consisting of slugs, birdshot, and buckshot. WILSON also stated he owned a flak jacket, kevlar helmet, and tiger stripe and multi cam gear. Accordingly, it is also believed some or most of these items are located in the PREMISES.

56.     On March 17, 2020, CHS-1 reported that WILSON's reaction to a possible new coronavirus quarantine was that he wasn't going to sit and wait for the government to come and kill him. WILSON also stated he could make his house a "fortress," if he had to. On March 22, 2020, WILSON asked UC-1 what the plan was for a worst-case scenario if they got pulled over subsequent to placing the VBIED. WILSON planned to be laying down in the backseat of UC-1's

19

vehicle. WILSON suggested he could shoot a police officer if they were pulled over. WILSON explained if the attack led back to him, there would be a "firefight" at his house.

57.    Based upon the investigation and facts described above, I submit that probable cause exists and request that search warrants be issued on the property described in Attachment A of this Affidavit, for the things described in Attachment B.

58.    WILSON shares the residence with his grandmother. Because multiple people share the premises as a residence, it is possible that the premises will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## TECHNICAL TERMS

59.    Based on my training and experience, I use the following technical terms to convey the following meanings:

      a.    IP Address:    The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static – that is, long-term – IP addresses, while other computers have dynamic – that is, frequently changed – IP addresses.

20

b.      Internet:  The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

c.      Storage medium:  A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

**COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS**

60.      As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

61.      *Probable cause.* I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.      Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the

21

file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

      b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space-that is, in space on the storage medium that is not currently being used by an active file-for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

      c.      Wholly apart from user-generated files, computer storage media-in particular, computers' internal hard drives – contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

      d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

62.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a.	Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.	As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer

23

owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

24

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.      I know that when an individual uses a computer to communicate about the commission of a crime, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was

25

used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

63.    *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.    The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.    Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and

26

configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.      *Variety of forms of electronic media.* Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

64.    *Nature of examination.*      Based on the foregoing, and consistent with Rule 41 (e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

65.    Because at least two people share the PREMISES as a residence, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

27

## **CONCLUSION**

66.     Based on the above facts, I believe that probable cause exists for the issuance of a warrant to search the premises described more fully in Attachment A for (1) property that constitutes evidence of the commission of a criminal offense; (2) contraband, the fruits of crime, or things otherwise criminally possessed; and/or (3) property designated or intended for use of which is or has been used as the means of committing a criminal offense, namely possible violations of 18 U.S.C. § 2339A, providing material support or resources to terrorists; 18 U.S.C. 842(p), distribution of information relating to explosives, destructive devices, and weapons of mass destruction; and 18 U.S.C. § 2332a, use or attempted use of weapons of mass destruction, including but not limited to the items listed in Attachment B.

Respectfully submitted,

Michael Buono
Special Agent
Federal Bureau of Investigation

**Sworn to by phone**

~~Subscribed and sworn to before me~~ on March 24, 2020

Honorable Sarah W. Hays
United States Magistrate Judge
Western District of Missouri

28